UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROGER STEIN,

        Petitioner,

v.                                                                   Case No. 16-cv-13087
                                                                     HON. MARK A. GOLDSMITH
JAMES SCHIEBNER,[1]

        Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Roger Stein filed this petition for writ of habeas corpus under 28 U.S.C. § 2254. Stein is serving a life sentence at a Michigan prison for his Jackson Circuit Court conviction of first-degree murder and related firearm offenses. Following a lengthy stay of proceedings to exhaust his state court remedies, Stein's habeas petition is now ready for decision. The Court denies habeas relief because all of Stein's claims are without merit or procedurally defaulted.

### I.   BACKGROUND

The charges against Stein arose from the shooting death of Ricky Upshaw outside a known drug house in Jackson, Michigan. The prosecutor's theory of the case was that Stein shot Upshaw in the back with a handgun after a verbal altercation. Three eyewitnesses identified Stein at trial as the shooter or as the only person seen holding a handgun at the time of the shooting: Winston Russell, Christopher Russell, and Charles Bigelow.

Christopher Russell, eighteen years old, testified at trial that Upshaw was like a brother to him. (ECF No. 10-3, at 147.) Upshaw was a rap artist who went by the name "Murda Rick." (Id.)

---

[1] The Court substitutes the Warden of the Muskegon Correctional Facility, James Schiebner, where Stein is currently incarcerated, as Respondent. See Habeas Rule 2(a), 28 U.S.C. § 2254.

1

On June 25, 2012, Upshaw and Winston Russell picked up Christopher at his house in a rented gray Nissan. The three men drove to a house on Adrian Street in Jackson. Upshaw and Winston got out of the car and started talking to Roger "Ghost" Stein while Christopher waited in the car. (Id. at 148.) Christopher knew Stein well. (Id. at 153-54.) Stein's burgundy Impala was parked in the driveway of the residence. (Id. at 160.) Christopher was not watching the men and could not hear what they were talking about when the sound of a gunshot drew his attention. (Id. at 150.)

Christopher looked up to see Winston running and Upshaw lying on his stomach. He noticed Stein standing in the driveway with a .38 caliber revolver in his hand. (Id. at 151, 161.) Stein was standing about seven feet away from Upshaw. (Id. at 162.) Stein climbed into his Impala and drove off. (Id. at 149-52.) Chrisopher got out of the car and ran to Upshaw. Upshaw could not speak and just clenched his fist. (Id. at 151.)

Christopher testified that he and Winston stayed at the scene for about two or three minutes and then drove to his sister's house. (Id. at 154.) Christopher left the scene because he was afraid that he would be killed. (Id. at 156.) His sister drove the two men to the police station later that night to make a statement. (Id. at 156-58.)

Winston Russell, thirty-two years old, testified that he was Upshaw's cousin. (Id. at 166.) Upshaw was twenty-one or twenty-two years old. (Id.) Winston knew Stein, whom he described as an "associate." (Id. at 167.) Winston denied that he was in the drug business with Stein. He explained that he and Stein went to clubs together where they "ball[ed] up females … That's the only business we had." (Id. at 183-184.) Winston explained that he and Upshaw had planned to drive to Detroit that day, but "Little Christopher" called them to pick him up. (Id. at 168.) Winston was driving a Nissan Ultima that his girlfriend had rented. (Id. at 169.)

2

According to Winston, after they picked up Christopher, Upshaw started arguing on the phone with his girlfriend, and so he pulled the car over on Adrian Street. Winston and Upshaw got out of the car and were standing and talking in front of Stein's car, which was backed into the driveway. (Id. at 170, 186.) Winston knew that Stein's girlfriend "Princess" owned the Impala. (Id. at 174.) Stein got out of the car, and he and Upshaw exchanged angry words for several minutes. (Id. at 172.) When Upshaw turned away from Stein, Stein shot him in the back. Winston saw Stein pull the gun, aim it, and fire it at Upshaw. (Id. at 178.) Stein then looked at Christopher and Winston before he got into the Impala and drove away. (Id. at 173-174.)

Winston ran, and Chirstopher checked on Upshaw. The two men then drove to Winston's child's mother's house and later came back to the scene. (Id. at 168-169.) When they returned, Winston saw police and an ambulance. Winston was shocked and did not talk to police at the scene. (Id. at 175-176.) He went to the police station about four hours after the shooting to give a statement. (Id. at 176.) Winston conceded, when he testified at the preliminary examination that he did not actually see the shot being fired. (Id. at 180-181.)

Charles Bigelow testified that he lived on Adrian Street across the street from the scene of the shooting. (Id. at 193, 196.) Bigelow knew Upshaw and Stein, but he did not know Winston or Christopher Russell. (Id. at 199-200.) Bigelow was sitting outside by the side of his house at the time of the incident. He was in a position where he could not see the location of the shooting. (Id. at 195.) Bigelow heard a pop and ran to the end of his driveway to see what happened. (Id. at 204.) Bigelow saw that Upshaw had been shot. ((Id. at 194.) He then noticed Stein's maroon Impala backed into the driveway, and Stein standing outside it holding a gun. (Id. at 194-95, 198.) Stein said something, then he got into the Impala and drove away. (Id. at 196.) Bigelow could not see whether anyone else was in the car with Stein when the Impala drove past him. (Id.)

3

Bigelow explained that he did not want to testify because of "threats towards me and my family." (Id. at 196.) Since the incident, there had been someone sitting in the alley by his house, and a car had been seen driving slowly past. (Id. at 196.) Bigelow testified that he did not identify Stein in the statement he made to police because "more said is more towards a hit on me and my family." (Id. at 197, 203.)

Jackson police officer Jennifer Flick testified that she was the first officer to arrive at the scene at around 10:00 p.m. (Id. at 131, 134.) Flick saw several people standing around a man who was lying face down on a driveway. (Id. at 131-133.) There was a small hole in the victim's back with a small amount of blood, and a bystander was pressing a cloth against the wound. (Id. at 137.) Flick rolled the man over but could not find a pulse. (Id. at 133.) A sternum rub failed to revive him. (Id. at 134-135.) Flick stayed at the scene for four or five hours. She did not find any weapons or shell casings. (Id. at 136.)

Detective Andrew Tisch testified that he was on a narcotics patrol the night of the shooting. (ECF No. 10-4, at 7-8.) He happened to drive by "Brewer's Home," a known drug house on Adrian Street, minutes before the shooting was reported. (Id. at 8.) As he drove by Adrian Street, he saw what he believed to be a rented silver Nissan with Illinois plates parked near the drug house. (Id. at 8.) He saw several people standing outside in the area. (Id. at 9.) Tisch continued on his patrol to a different street, and about three minutes later he received a call about the shooting. When he arrived back at Adrian Street, the Nissan was gone. (Id. at 9.) Tisch did not see if a vehicle had been parked in the driveway of the drug house when he first drove past, and from his position he believed he would not have been able to see one if it had been parked there. (Id. at 16-17.)

Marilyn Johnson testified that she has known Stein since they were children. (Id. at 20-21.) Johnson lived in Albion. (Id. at 25.) On the night of the shooting, Stein called Johnson around

4

10:00-10:30 p.m. and asked her for a ride to Battle Creek, a normal occurrence. (Id. at 22, 26.) Johnson picked Stein up at Ash Street in Albion. (Id. at 22.)

As Johnson was driving with Stein on the highway, she was pulled over by police. (Id.) Stein told Johnson to keep driving when he first noticed the police car, and he climbed into the back seat. (Id. at 35.) Stein told her that he would tell her about what was happening later. (Id. at 36.) When Johnson pulled over the police officers asked Stein questions, and he was arrested. (Id. at 25.) Johnson had seen Stein drive a burgundy Impala that belonged to his girlfriend "Princess." (Id. at 24-25.)

Relevant to one of Stein's claims, on cross-examination defense counsel asked Johnson about Stein's character and whether he was a violent person. Johnson answered, "I mean he done been in prison." (Id. at 39.)

Detective Scott Watson testified that on the night of the incident police were looking for a burgundy Impala, and they were also looking for Stein in Albion where he had known contacts. (Id. at 42-43.) The Impala was found in Stein's girlfriend's possession at a gas station in Albion at about 10:00 a.m. on the morning after the incident. (Id. at 44.) Watson heard on the radio that Stein had been pulled over and arrested in Calhoun County. (Id. at 49-50.)

Dr. Ruben Ortiz-Reyes, the medical examiner, testified that Upshaw died from a single gunshot wound. (Id. at 60.) The bullet entered Upshaw's back, passed through the spine between two vertebrae, continued through the aorta and left lung, and stopped before exiting the chest. (Id. at 65.) Ortiz-Reyes found about two-liters of blood in Upshaw's chest cavity, and more blood had filled his lung. (Id. at 65.)

Detective Sergio Garcia testified that Christopher and Winston Russell were interviewed separately after the shooting. (Id. at 77.) No gun was ever recovered. (Id. at 82.) The detective

5

attempted to interview Stein. (Id. at 85.) Stein told him that he was at a fireworks show in Detroit at the time of the shooting, and then he discontinued the interview. (Id. at 86.)

Following closing arguments and jury instructions, the jury found Stein guilty of the charged offenses, and he was sentenced to mandatory life imprisonment for the murder conviction and lesser terms for two related firearm offenses. (ECF Nos. 10-5 and 10-6.)

Stein was appointed appellate counsel, who filed a motion for new trial. The motion asserted that trial counsel was ineffective for failing to present an alibi defense and for eliciting testimony from Johnson that Stein had been to prison. (ECF No. 10-9, PageID.839-840.)

The trial court held an evidentiary hearing on the motion on December 13, 2013. (ECF No. 10-7.) Stein testified at the hearing that he was at his girlfriend Calvin-Lynn Mosley's house during the day of June 25, 2012. (Id. at 12-13.). Stein said he left her house around 5:30 p.m. while Mosley was asleep. (Id. at 13-14.) Stein had received a call from his cousin, Philip Sango. Sango told Stein that he would pick him up to go to the Detroit fireworks show. (Id. at 15-16.)

Sango and Stein first made a stop in Jackson, and they left for Sango's house in Taylor at around 6-6:30 p.m. (Id. at 17.) The two men left for the fireworks show from Sango's house around 8:30-9:00 p.m., and they stayed in Detroit until about midnight. (Id. at 18-19.) Stein slept at Sango's house, and Mosely picked him up the next day in her burgundy Impala at around 8-8:30 a.m. and drove him to Albion. (Id. at 17-21.)

Stein testified that Marilyn Johnson was a family friend. (Id. at 22.) He wanted to discuss her testimony with defense counsel, but his attorney would not listen to him. (Id. at 22.) He did not ask his counsel to question Johnson about whether he was a violent person. (Id. at 22.)

Anthony Raduazo testified that he was appointed to represent Stein at trial. (Id. at 27.) He obtained all the police reports in preparation for trial. (Id. at 28.) Stein told Raduazo that he was

with a person named Ebenisha at the time of the incident. (Id. at 29-30.) Stein provided a phone number for her, but when counsel tried calling the number he found that it had been disconnected. (Id. at 30.) Counsel could not find anybody by that name. (Id. at 30.) Counsel called other family members who Stein said he was with, but he did not learn anything helpful. (Id. at 30.) The name Philip Sango was new to him, and it was one that Stein had never mentioned. (Id. at 30.)

Counsel explained that he "did not find probably the same level of cooperation you found when you attempted to deal with the family. I had one family member basically tell me 'what do you want me to say.' ... I was really chasing my tail … I was not successful. There was nobody there that would really come forward and tell me anything other than the fact that they had no idea where he was." (Id. at 31-32.) According to counsel, Stein never told him that he was in Detroit. "[H]e told me he was with Ebenisha [] in Jackson, and that didn't check out." (Id. at 33.) Stein never told his counsel that he was at the fireworks show. (Id. at 33.) Counsel reviewed his notes, and they confirmed that Stein mentioned someone named Ebenisha, but they did not indicate anything about a person named Sango. (Id. at 38.)

With respect to questioning Johnson at trial about whether Stein was violent, counsel explained that Stein was very active during trial about having him ask particular questions of witnesses. (Id. at 33-34.) Stein told counsel to ask Johnson about him because they knew each other well. (Id. at 34-35.) Counsel knew that Stein had a criminal record, and in retrospect he agreed that "perhaps [he] should not have asked the question." (Id. at 35-36.)

During his discussions with counsel, Stein put himself at the scene of the crime. (Id. at 41-42.) Stein made a diagram of crime scene for counsel. (Id.) Counsel "did not feel in good conscience, based on what I knew, that I could put Mr. Stein on the stand because that would suborn perjury, and I could not do that." (Id. at 43-44.)

At the close of the first day of testimony, Stein's appellate counsel stated that he had additional witnesses he wished to call, "if they come forward, frankly. I don't know, you know." (Id. at 52-53.) In fact, counsel had stated at the beginning of the hearing that he "had asked [Stein's] uncle, Philip Sango to be here. I talked to him by phone. I sent a letter. He's not here. I suspect he's never going to be here." (Id. at 4-5.) The Court adjourned the hearing to give counsel additional time to produce Sango and any other witnesses. (Id.)

The next hearing occurred about three months later, on March 10, 2014. (ECF No. 10-8.) Between the two hearing dates Sango died. (Id. at 3-4, 13.) Stein testified again and contradicted his counsel's testimony. Stein said he told his counsel that he was at the fireworks in Detroit. (Id. at 6-7.) He also told counsel that he was with Sango and gave him Sango's phone number and the name and number of another witness. (Id. at 7-8). Stein testified that counsel told him that he tried calling these witnesses, whereas the witnesses told Stein that no one ever tried to contact them. (Id. at 8.) Stein also denied that he told counsel that he was at scene. (Id. at 9.) He admitted that he helped make the diagram, but he explained that he and counsel made it together with the aid of the police reports and witness statements. (Id. at 9-10.)

The trial court denied the motion for new trial. The court accepted defense counsel's testimony as credible. The court found that Stein had only told counsel about a person named Ebenisha as an alibi witness and that Sango was never mentioned. (Id. at 26.)

The case then proceeded to the Michigan Court of Appeals. Stein filed an appellate brief that raised the following three claims:

> I. Defendant was denied a fair trial because the trial court refused grant a continuance of the trial so that he could produce a key witness.
>
> II. The Defendant should receive a new trial because his attorney provided ineffective assistance of counsel in opening the door to highly prejudicial testimony about the defendant's previous prison sentence and involvement in violence.

III. The Defendant should receive a new trial because his attorney provided ineffective assistance of counsel in failing to investigate and offer an alibi defense.

On February 3, 2015, the Michigan Court of Appeals affirmed Stein's convictions in an unpublished opinion. People v. Stein, No. 314482, 2015 WL 447544 (Mich. Ct. App. Feb. 3, 2015). The Michigan Supreme Court subsequently denied Stein's application for leave to appeal by standard order. People v. Stein, 868 N.W.2d 629 (Mich. 2015) (Table).

On June 28, 2016, Stein filed a motion for relief from judgment in the trial court that raised the following claims:

> I. There was insufficient evidence presented to support Mr. Stein's conviction for first-degree murder.
>
> II. Mr. Stein was denied his constitutional right to a fair trial and due process and equal protection by the trial court systemically excluding African-Americans from the jury panel.
>
> III. The prosecution knowingly suppressed exculpatory evidence violating Mr. Stein's due process rights.
>
> IV. Mr. Stein's appellate counsel's performance was constitutionally deficient by failing to investigate into issues to raise on direct appeal resulting in prejudice to Mr. Stein's appeal.

(ECF No. 10-11, PageID.912.)

Stein did not wait for his state post-conviction proceeding to be decided before filing his federal habeas petition. On August 25, 2016, Stein filed his federal petition along with a motion to stay proceedings. (ECF Nos. 1 and 3.) The habeas petition raised the following claims:

> I. Defendant was deprived a fair trial because the trial court refused to grant a continuance of the trial so that he could produce a key witness.
>
> II. Defendant should receive a new trial because his attorney provided ineffective assistance of counsel in opening the door to highly prejudicial testimony about the defendant's previous prison sentence and involvement in violence.

9

III. Defendant should receive a new trial because his attorney provided ineffective assistance of counsel in failing to investigate and offer an alibi defense.

IV. There was insufficient evidence presented to support Mr. Stein's conviction for first-degree murder.

V. Mr. Stein was denied his constitutional right to a fair trial and due process and equal protection by the trial court systematically excluding African-Americans from the jury panel.

VI. The prosecution knowingly suppressed exculpatory evidence violating Mr. Stein's due process rights.

VII. Mr. Stein's appellate counsel's performance was constitutionally deficient by failing to investigate into issues to raise on direct appeal resulting in prejudice to Mr. Stein's appeal.

(ECF No. 1, PageID.6-12.)

The Court granted the motion for stay of proceedings while Stein exhausted his post-conviction claims. (ECF No. 6.)

Meanwhile, back in state court, by order dated November 9, 2016, the trial court denied the motion for relief from judgment. The court found that Stein failed to demonstrate actual prejudice as required by Michigan Court Rule 6.508(D)(3)(b) to be entitled to relief from judgment. (ECF No. 10-14, PageID.944-945.)

Stein appealed to the Michigan Court of Appeals, but his application for leave to appeal was denied because Stein "failed to establish that the trial court erred in denying the motion for relief from judgment." (ECF No. 10-15, PageID.947.) On April 3, 2018, the Michigan Supreme Court also denied leave to appeal by form order. (ECF No. 10-16, PageID.1007.)

Stein successfully moved to reopen his federal habeas case on February 14, 2019. (ECF Nos. 5 and 6.) But on October 22, 2019, Stein once again successfully moved to stay the case. Stein asserted that he had discovered new evidence indicating that Winston Russell had murdered Sango, suggesting that it was Russell and not Stein who also murdered Upshaw. Stein asserted that

10

Russell murdered Sango before he could testify at the post-conviction hearing as to Stein's alibi to cover up his own responsibility for Upshaw's murder. (ECF No. 13, PageID.1092-96, ECF No. 14.)

Stein then filed a second motion for relief from judgment in the trial court raising this new claim:

> I. Mr. Stein is entitled to a new trial since there was newly discovered evidence revealing that the prosecution's chief witness against Sten, Wilson Russell, has been charged and is currently being prosecuted for the murder of Mr. Stein's alibi witness, Sango. The newly discovered evidence supports his innocence and demonstrates that the witnesses had a motive to lie at trial.
>
> II. The court can and should address the merits of Mr. Stein's underlying claim because MCR 6.502(g)(2) does not preclude claims of newly discovered evidence.

(ECF No. 26-2).

After an extended delay, the trial court held its first hearing on the motion on August 27, 2021. (ECF No. 26-3.) It was confirmed at the hearing that Winston Russell had indeed been charged with murdering Sango, but the charges were dismissed on August 9, 2021. (Id. at PageID.1345.) It was the prosecutor's theory that Russell murdered Sango in revenge for Upshaw's murder. (Id. at PageID.1347.) Given the recency of the dismissal of the charges against Russell, the hearing was adjourned.

The next hearing was held in the trial court on January 28, 2022. (ECF No. 26-5.) Stein had obtained substitute counsel, who needed additional time to prepare. It was revealed at this second hearing date that Russell had confessed to murdering Sango, but the charges against him were nevertheless dismissed after the confession was suppressed. (Id. at PageID.1365.) Stein's new attorney requested and received permission to view the prosecution file regarding Russell's case. (Id. at 1366-69.)

11

Finally, on September 9, 2022, an evidentiary hearing was held on Stein's second motion for relief from judgment. (ECF No. 26-6.) Winston Russell testified that he was in prison on drug charges. (Id. at 1377.) Russell stated that while he was in prison, he found himself at the same facility as Stein. (Id. at PageID.1378.) At Stein's request, Russell wrote a letter admitting that Stein was not involved in Upshaw's murder. (Id. at PageID.1379, 1781.) Russell explained, however, that the letter was untrue: "I wrote a note at that time because the situation that I was in by me being on my way home, I didn't want to get in a conflict with him. So, yeah, I wrote a note, but at the end of the day, I testified to what happened…. And that's what happened." (Id. at PageID.1378.) Russell just wanted to get Stein away from him. (Id. at PageID.1380.) Russell was worried about being attacked and was "doin' whatever I gotta' do to get home." (Id. at PageID.1382, 1386.) Stein and Russell were now at separate facilities. (Id. at PageID.1386.)

Stein gave a different account. Stein testified that when Russell arrived at his prison, Stein was the one who was afraid of Russell and requested to be moved to a different facility. (Id. at PageID.1389.) According to Stein, when Russell saw him in prison, Russell hugged him and apologized. (Id. at PageID.1390.) Stein claimed that Russell wrote the recanting letter on his own initiative. (Id. at PageID.1390.)

The trial court denied motion for relief from judgment by order dated January 30, 2023. (ECF No. 26-7.) Though not stating so explicitly, the trial court seemed to credit Russell's testimony and denied the motion on the basis that Stein "fail[ed] to present new evidence or a retroactive change in the law…." (Id. at PageID.1403-1404.)

Stein appealed, but the Michigan Court of Appeals affirmed and denied leave to appeal because Stein "failed to establish that the trial court erred in denying the successive motion for

12

relief from judgment. MCR 6.502(G)." (ECF No. 26-8, PageID.1405.) The Michigan Supreme Court denied leave to appeal by form order on May 29, 2024. (ECF No. 26-9, PageID.1484.)

Stein thereafter filed a motion to reinstate his federal habeas petition (ECF No. 16). He later filed a second-amended petition on February 18, 2025. (ECF No. 23.) The second-amended petition raises one claim:

> I. Petitioner was denied his U.S. Constitutional right under the Fourteenth Amendment where evidence that would have impacted the credibility of the prosecution's key witness, revealing gross violations of Brady v. Maryland entitling Petitioner to habeas relief.

(ECF No. 23).[2]

## II.    LEGAL STANDARD

28 U.S.C. § 2254(d)(1) limits a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme]

---

[2] The Court assumes that Stein is raising the claims presented in his initial petition as well as this new claim.

Court but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quoting Williams, 529 U.S. at 413).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.... As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103 (internal quotation omitted).

### III.    ANALYSIS

#### A.

Stein first claims that he was denied a fair trial when the trial court denied a continuance to afford him the opportunity to call a police detective to testify that the area of the shooting was a dangerous one where previous drug-related shootings had occurred. The claim was raised on direct appeal, and after reciting state law principles related to motions for a continuance, the Michigan Court of Appeals found that Stein waived review and otherwise failed to demonstrate prejudice:

> The record indicates that defendant duly attempted to procure the missing detective's testimony. In fact, the trial court indicated that the detective could testify by telephone, but defendant insisted that he wanted the detective physically present. When informed that the trial court would allow the testimony only by phone, defense counsel advised defendant of the ruling, stating, "We either—either do that or we proceed without him. You can raise it on appeal." Defendant thereafter stated,

14

"Yeah, I'll just raise it on appeal." Defendant, then, when presented with the opportunity to have the witness's testimony provided to the jury, waived presentation of the same.

Defendant also failed to meet his burden to show that the testimony he would have presented through the detective was material. Mich. Ct. R. 2.503(C)(2). "Materiality" of evidence refers to whether the evidence was of consequence to the determination of the action. People v. Mills, 450 Mich. 61, 67 (1995), modified 450 Mich. 1212 (1995). Based on counsel's offer of proof of what he expected to elicit from the detective, it appears that the detective could not provide any evidence apart from testimony the jury already heard from another detective. Moreover, defendant fails to show that he was prejudiced by the trial court's failure to adjourn. Coy, 258 Mich. App. at 18-19. Defendant has not shown that anything other than cumulative testimony would have been introduced through the detective's testimony. Therefore, the trial court did not commit plain error affecting defendant's substantial rights when it failed to adjourn trial. Carines, 460 Mich. at 763.

(ECF No. 10-9, PageID.772.)

Under federal law, "[t]he decision whether to grant a motion for continuance is within the discretion of the trial judge." Powell v. Collins, 332 F.3d 376, 396 (6th Cir. 2003) (citing Ungar v. Sarafite, 376 U.S. 575, 589-90 (1964)); see also Morris v. Slappy, 461 U.S. 1, 11 (1983) (noting that trial courts have broad discretion in deciding whether to grant a continuance). "Absent proof of a violation of a specific constitutional protection, a habeas petitioner must show that a trial error was so egregious as to deprive him of a fundamentally fair adjudication, thus violating constitutional principles of due process." Id. (citing Cooper v. Sowders, 837 F.2d 284, 286 (6th Cir. 1988). A trial court's denial of a continuance rises to the level of a constitutional violation only when there is an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay. Burton v. Renico, 391 F.3d 764, 772 (6th Cir. 2004) (quoting Morris, 461 U.S. at 11-12 (quoting Ungar, 376 U.S. at 589)). Additionally, a habeas petitioner must show that he suffered actual prejudice as a result of the trial court's denial of his request for a continuance. Burton, 391 F.3d at 772 (citing Powell, 332 F.3d at 396). "Actual prejudice may be

15

demonstrated by showing that additional time would have made relevant witnesses available or otherwise benefited the defense." Powell, 332 F.3d at 396.

The Michigan Court of Appeals did not unreasonably apply these principles in denying Stein's claim. The state court found that Stein failed to demonstrate prejudice (it used the term "materiality") because the missing witness's testimony would have been cumulative to the testimony presented at trial. That statement reasonably and accurately describes the record.

At trial, detective Tisch testified that the house where the shooting occurred on Adrian was a known drug house in an area of high drug activity. (ECF No. 10-4, at 8, 14.) He testified that confidential informants told police that they bought drugs from that house. (Id. at 12.) Tisch also opined that the fact the car he spotted on the street appeared to be a rental call suggested that drug activity was taking place. (Id. at 8.) Tisch also testified to the obvious connection between drugs and violence. (Id. at 14.)

Defense counsel indicated that he needed the adjournment to call Detective Smith so he could establish that a narcotics task force was surveilling the area and that it was dangerous. (Id. at 111.) Defense counsel, however, was unable to articulate how Smith's testimony would have been materially different from what the jury had already heard from Tisch. (Id. at 114-16.) In response, the prosecutor stated that Smith was included on its witness list only because he was the detective who authored the police report about what Tisch told Smith, suggesting that Smith did not have any additional independent information. (Id. at 119.) Given the offers of proof made by the parties, the trial court concluded that Smith's testimony would be cumulative to Tisch's, and it suggested that Smith could testify by phone if Stein still wished to have him testify. (Id. at 122.) Stein declined the offer and decided instead to "just raise it on appeal." (Id. at 124.)

Given this record, the Michigan Court of Appeals reasonably found that Stein failed to demonstrate that he was prejudiced by the denial of his motion for a continuance. Stein sought and was granted multiple opportunities to enlarge the record post-trial. Stein chose to focus his efforts on enlarging the record with respect to his alibi claim. Stein never made an offer of proof as to how Smith would have testified to facts beyond those covered by Tisch. There is nothing in the record, therefore, to support Stein's assertion that he was prejudiced by the failure to grant a continuance. The adjudication of this claim by the state court did not involve an unreasonable application of established federal law.

B.

Stein next asserts that his trial attorney rendered ineffective assistance of counsel when he elicited testimony from Johnson that Stein had been to prison. The claim was raised by Stein on direct appeal following an evidentiary hearing. After reciting the applicable standard governing claims of ineffective assistance of counsel, the Michigan Court of Appeals rejected the claim on the merits as follows:

> Counsel's performance in this case did not fall below an objective standard of reasonableness. Swain, 288 Mich. App. at 643. Although counsel opened the door to testimony regarding defendant's propensity for violence, the evidentiary hearing record indicates that defendant directed counsel to ask the witness about defendant's character. If a defendant knowingly directs a particular strategy, an otherwise constitutionally ineffective strategy should not be grounds for relief. Keith v. Mitchell, 455 F3d 662, 672 (6th Cir. 2006). Therefore, because defendant directed this line of questioning, counsel was not ineffective. Regardless, defendant also failed to establish a reasonable probability that, but for counsel's error, the outcome of his trial would have been different. Swain, 288 Mich. App. at 643. In response to the prosecutor's question of whether the witness knew defendant to have gotten in trouble for being a violent person, the testimony that defendant had been to prison was brief and only minimally prejudicial, particularly where defendant stipulated at trial that he was a convicted felon. Consequently, defendant cannot show counsel was ineffective for opening the door to this testimony.

(ECF No. 10-9, PageID.772-73.)

17

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court established the familiar two-part test for determining whether a defendant received ineffective assistance of counsel. First, a defendant must show that counsel's performance was deficient. Id. at 687. This requires showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. Second, a defendant must establish that counsel's deficient performance prejudiced the defense. Id. This requires showing that counsel's errors were so serious that they deprived the petitioner of a fair trial or appeal. Id.

As to the first element, a defendant must identify acts that were "outside the wide range of professionally competent assistance" to prove deficient performance. Id. at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. Id. at 689. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. The defendant bears the burden of overcoming the presumption that the challenged actions were sound trial strategy. Id. at 689.

As to the second element, a defendant proves prejudice by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. Id. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." Id. at 686.

"The standards created by Strickland and 2254(d) are both highly deferential, . . . and when the two apply in tandem, review is doubly so." Harrington, 562 U.S. at 105 (punctuation modified). "When 2254(d) applies, the question is not whether counsel's actions were reasonable. The

question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

The Court of Appeals first determined that counsel's question to Johnson was not professionally deficient because Stein directed him to ask the question. Defense counsel's testimony at the evidentiary indicated that Stein was an active participant at his trial. (ECF No. 10-7, at 44-47.) Stein asked counsel to question Johnson whether he was "a good guy" because she knew him. (Id.) The trial court found defense counsel's testimony credible. (ECF No. 10-8, at 23, 25.) While it is true that counsel regretted following Stein's direction, the fact that he was following his client's directions provided the state court with a reasonable basis for rejecting the claim. See Coleman v. Mitchell, 268 F.3d 417, 448 (6th Cir. 2001) ("If the record indicated a clear, informed assertion by Petitioner that he did not wish his counsel to present any mitigation evidence in Petitioner's behalf, case law may have supported the district court's conclusion that counsel, merely respecting the informed wishes of a client, need not have investigated or presented any evidence in connection with Petitioner's background at the penalty phase of the trial."); Bacon v. Klee, No. 15-2491, 2016 WL 7009108, at *5 (6th Cir. 2016) (claim of ineffectiveness not valid where trial counsel acted pursuant to defendant's direction).

And even if counsel performed deficiently by asking Johnson about Stein's character without knowing how she would reply, the state court reasonably found that Stein did not establish Strickland prejudice. Johnson merely stated that Stein had been to prison. This isolated reference did not add substantially to information that the jury already heard. Stein stipulated at trial to the fact that he was a convicted felon with respect to the relevant firearm charges. (ECF No. 10-3, at 4, 129; ECF No. 10-4, at 182.) The claim was, therefore, reasonably rejected by the state court.

19

C.

Stein next claims that his counsel was ineffective for failing to raise an alibi defense at

trial. This claim was rejected on direct appeal by the Michigan Court of Appeals as follows:

> The evidentiary hearing record establishes that counsel reasonably investigated every alibi witness who defendant actually presented to him, but none could provide an alibi. Counsel, as a result, proceeded with a different trial strategy. Whether to call or question a witness is presumed to be a matter of trial strategy. People v. Davis, 250 Mich. App. 357, 368 (2002). Defendant has not shown otherwise in this case. Furthermore, no alibi witness testified at the evidentiary hearing about defendant being in Detroit. Because no evidence was presented that an alibi witness would have testified favorably to defendant at trial, defendant has also not shown that he was prejudiced by counsel's performance. See People v. Pickens, 446 Mich. 298, 327 (1994). Accordingly, counsel was not ineffective.

(ECF No. 10-9, PageID.773.)

"Under Strickland, trial counsel has a duty to investigate his case[.]" Stewart v.

Wolfenbarger, 468 F.3d 338, 356 (6th Cir. 2006). "This duty includes the obligation to investigate

all witnesses who may have information concerning . . . [a] client's guilt or innocence." Id.

(quoting Towns v. Smith, 395 F.3d 251, 258 (6th Cir. 2005)) (emphasis added).

Stein and his defense attorney gave contradictory testimony regarding counsel's decision

not to present an alibi defense. Stein testified that he told his counsel he was at the fireworks in

Detroit with Sango. Defense counsel testified that Stein never mentioned anyone named Sango,

never told him he was at the fireworks in Detroit, and he only identified being with a person named

Ebenisha in Jackson. Counsel's trial notes, which mentioned an Ebenisha but not Sango,

corroborated his testimony. At the first hearing date on Stein's motion for new trial, Stein's

appellate counsel was unable to call Sango as a witness, and indeed, he suggested to the court that

Sango was unwilling and would never be willing to appear. Sango was then murdered before the

second hearing date. No other witness testified to seeing Stein with Sango in Detroit at the time of

20

the incident. Based on this record, the trial court made a finding of fact that trial counsel's version of what Stein told him was credible and denied the claim.

A determination of a factual issue made by a state court is presumed to be correct on federal habeas review, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Davis v. Lafler, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); Lancaster v. Adams, 324 F.3d 423, 429 (6th Cir. 2003); Bailey v. Mitchell, 271 F.3d 652, 656 (6th Cir. 2001). Stein does not offer clear and convincing evidence that the trial court's findings of fact were incorrect. That is, nothing presented by Stein at the first evidentiary hearing "required the state court to conclude that [trial counsel] lied to the court." Fry v. Shoop, 124 F.4th 1019, 1026 (6th Cir. 2025). The state court adjudication of this claim, therefore, complied with Strickland.

## D.

Stein's next four claims were presented to the state court in his first motion for relief from judgment. His fourth claim asserts that insufficient evidence was presented to sustain his convictions. His fifth claim asserts that the jury venire did not contain a fair cross-section of the community. His sixth claim asserts that the prosecutor withheld exculpatory evidence. His seventh claim asserts that his appellate counsel was ineffective for failing to raise these claims on direct appeal. Respondent asserts that review of these claims is procedurally defaulted because the trial court denied relief for Stein's failure to demonstrate prejudice under Michigan Court Rule 6.508(D)(3)(b). (ECF No. 9, PageID.173, 177, 180.)

A habeas petitioner's claim is procedurally defaulted when the state court considering the claim rejects it based explicitly on an independent and adequate state procedural rule. See Martinez v. Ryan, 566 U.S. 1, 9 (2012); Wainwright v. Sykes, 433 U.S. 72, 85-87 (1977).

Here, the trial court explicitly determined that Stein failed to demonstrate actual prejudice for failing to present these claims on direct appeal under Rule 6.508(D)(3)(b). (ECF No. 10-14, PageID.944-945.) The trial court's reliance on this ruse as a grounds for decision constitutes the invocation of an independent and adequate state procedural rule barring federal habeas review of the claims. See Gurnsey v. Prelesnik, No. 11-15038; 2014 WL 1977021, at *8–10 (E.D. Mich. May 15, 2014) (citing Rule 6.508(D)(3)(b)); Ivory v. Jackson, 509 F. 3d 284, 292-293 (6th Cir. 2007); Howard v. Bouchard, 405 F. 3d 459, 477 (6th Cir. 2005)); see also Guilmette v. Howes, 624 F.3d 286, 291 (6th Cir. 2010) (en banc) (describing Mich. Ct. R. 6.508(D)(3) as a "procedural-default rule").

The subsequent unexplained orders issued by the Michigan Court of Appeals and Michigan Supreme Court make the decision of the trial court the relevant one for determining whether Stein defaulted these claims. See Guilmette, 624 F.3d at 291.

To overcome the procedural default, Smith must demonstrate "cause" for noncompliance with state procedural rules and "actual prejudice" resulting from the alleged constitutional violation. See Coleman v. Thompson, 501 U.S. 722, 750-51 (1991); Nields v. Bradshaw, 482 F.3d 442 (6th Cir. 2007). "Cause" means that some external impediment frustrated the petitioner's ability to comply with the state's procedural rules. See Murray v. Carrier, 477 U.S. 478, 488 (1986). Such impediments include interference by officials, attorney error rising to the level of ineffective assistance of counsel, or a showing that the factual or legal basis for a claim was not reasonably available. See McCleskey v. Zant, 499 U.S. 467, 493-494 (1991).

Stein asserts in his seventh claim that the ineffectiveness of his appellate counsel for failing to raise these claims on direct appeal excuses his default. To demonstrate ineffective assistance of appellate counsel, a habeas petitioner must show that his counsel performed deficiently and that

22

but for the deficient performance there is a reasonable probability of a different result on appeal. Smith v. Robbins, 528 U.S. 259, 285 (2000) (citing Strickland, 466 U.S. 668). Appellate counsel, however, need not "raise every nonfrivolous claim on direct appeal." Monzo v. Edwards, 281 F.3d 568, 579 (6th Cir. 2002). Rather, a petitioner can overcome the presumption of effective assistance of counsel only by showing that the "[omitted] issues are clearly stronger than those presented." Id.

None of the defaulted claims are "clearly stronger" than the ones appellate counsel raised on direct review. Three eyewitnesses identified Stein as the perpetrator, rendering his sufficiency of the evidence claim quite weak. See, e.g., Brown v. Davis, 752 F.2d 1142, 1144 (6th Cir. 1985) ("[T]he testimony of a single, uncorroborated prosecuting witness or other eyewitness is generally sufficient to support a conviction.") (internal citations omitted); see also Brown v. Burt, 65 F. App'x 939, 944 (6th Cir. 2003).

With respect to the fair cross-section claim, Stein never objected to the composition of the venire at trial. Moreover, the claim consists of conclusory allegations of systematic exclusion that are devoid of an evidentiary proffer regarding the venire's actual composition at trial. (ECF No. 1, PageID.53-54.) Similarly, with respect to his suppression of evidence claim, Stein has never proffered evidence regarding the existence of a police report containing additional information regarding narcotics surveillance activities at Brewer's House. The claim speculates that the contents of Detective Smith's report suggests the existence of additional reports. (Id. at PageID.55-58.) A claim based on speculation, however, is not "clearly stronger" than the claims raised by appellate counsel on direct appeal. Stein has, therefore, failed to demonstrate cause to excuse his default.

Stein's procedural default can nevertheless be excused if he can satisfy the "narrow exception for fundamental miscarriage of justice" which "is reserved for the extraordinary case in which the alleged constitutional error probably resulted in the conviction of one who is actually innocent of the underlying offense." Rogers v. Skipper, 821 F. App'x 500, 503 (6th Cir. 2020) (citing Dretke v. Haley, 541 U.S. 386, 388 (2004); Schlup v. Delo, 513 U.S. 298 (1995)).

To establish entitlement to review under this exception, a habeas petitioner must demonstrate that he is actually innocent. Schlup, 513 U.S. at 326-327. "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Id. at 324. The evidence "must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id. at 327.

Stein does not present convincing new evidence of his innocence. Stein asserts that Russell murdered Sango, and he argues that this shows that Russell must have also murdered Upshaw and attempted to cover-up his involvement by murdering Stein's alibi witness before he could testify at the post-trial hearing. The charges against Russell were dismissed, however, and the prosecutor's theory was that Russell murdered Sango in revenge for Stein's murder of Upshaw and not to eliminate an alibi witness. Russell viewed Upshaw as a cousin, and Sango was Stein's uncle, suggesting some form of twisted street justice as a possible motive.

Moreover, the trial court heard the contradictory testimony of Stein and his trial attorney regarding whether Stein told his attorney that he was with Sango at the time of the murder. The trial court decided to accept trial counsel's testimony as credible, and that determination is presumed correct here. The theory that Russell murdered Sango because Sango was an alibi

witness is far less believable given the presumptively true fact that Stein never told his trial attorney prior to trial that he was with Sango at the time of the murder. Accordingly, not every reasonable juror would be convinced that Stein is innocent, even if Stein could establish that Russell murdered Sango.

Stein also asserts that Russell wrote a letter recanting his trial testimony. Russell testified in state court, however, that he wrote the letter while he was in prison with Stein to avoid being attacked by Stein. Not every reasonable juror would agree that Stein is innocent in light of Russell's recanting letter given Russell's testimony explaining his reason for writing the letter.

Stein, therefore, has not demonstrated entitlement to review of his defaulted claim by way of the narrow fundamental miscarriage of justice exception.

E.

Stein's final claim asserts that the trial prosecutor suppressed additional exculpatory evidence concerning Winston Russell.[3] Stein asserts that the prosecutor failed to disclose Russell's criminal history and a prior incident where he planned to falsely accuse another person of a crime. (ECF No. 23, PageID.1221-1223.) Stein asserts that publicly available state prison records show that Russell has a 2005 larceny conviction. (Id. PageID.1224.) He also asserts that Russell's former girlfriend filed a police report on November 20, 2012, claiming that Russell told her he would plant a firearm in her yard to get her arrested. (Id. PageID.1234.)

---

[3] To the extent this claim largely repeats the allegations regarding Russell's alleged murder of Sango, that argument has been addressed and rejected above inasmuch as it provides a potential basis for excusing Stein's procedural default. As an independent claim seeking habeas relief, the claim is not cognizable. Freestanding claims of actual innocence cannot serve as an independent basis for granting habeas relief. See McQuiggin v. Perkins, 569 U.S. 383, 392 (2013); Cress v. Palmer, 484 F.3d 844, 854–55 (6th Cir. 2007).

25

This factual basis for the claim was not raised in the state trial court in Stein's second motion for relief from judgment. (ECF No. 26-2, PageID.1316-1335.) The motion centered on the factual allegation that Russell murdered Sango, and under the state law legal theory allowing for freestanding claims of newly discovered evidence constituting grounds for a new trial. (Id.)

A federal court may not grant habeas relief to a state prisoner unless the prisoner first exhausts his remedies in state court. O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999). The habeas petitioner bears the burden of establishing exhaustion. Rust v. Zent, 17 F.3d 155, 160 (6th Cir. 1994). The exhaustion doctrine requires a habeas petitioner to present the state court with the same factual and legal basis for his claims as he presents in federal court. See, e.g., McMeans v. Brigano, 228 F.3d 674, 681 (6th Cir. 2000).

Stein did not present the state trial court with the factual allegation regarding Russell's prior criminal history or the incident with his former girlfriend. Nor did he present the trial court with the legal basis for the claim he presents here. Rather, his second motion for relief from judgment was based on the factual allegations regarding Russell being charged with Sango's murder and the argument that this entitled him to a new trial under the state-law principle announced in People v. Cress, 468 Mich. 678 (2003). The version of the claim presented here is not merely unexhausted, but it is also procedurally defaulted because Stein no longer has a procedural mechanism to present it to the state courts. See Gray v. Netherland, 518 U.S. 152, 161-162 (1996). Stein cannot demonstrate cause to excuse this default because he has not and cannot explained why he failed to include his present argument in his second motion for relief from judgment filed with the state trial court.

Setting aside the fact that the claim is defaulted, it is also without merit. The court may deny relief on the merits of an unexhausted claim. 28 U.S.C. § 2254(b)(2). "[T]he suppression by

the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 683 (1985).

Here, nothing in the record supports the allegation that defense counsel did not have the relevant information regarding Russell's criminal history. At the post-conviction hearing, defense counsel testified that he had the criminal records for Stein from the same source Stein asserts that he found Russell's prior larceny conviction. (ECF No. 10-7, PageID.720.) There is no reason to believe defense counsel did not have access to the same criminal history with respect to Russell. See, e.g., Coe v. Bell, 161 F.3d 320, 344 (6th Cir. 1998) (No Brady violation where petitioner had access to same source of information as prosecution). As for the police report made by Russell's former girlfriend, there is likewise nothing in the record to support Stein's contention that it was suppressed by the prosecution.

Moreover, Stein cannot demonstrate that any suppressed evidence was material under Brady. At most, Stein had shown that his counsel could have challenged Russell's credibility at trial with evidence that he was convicted of a larceny offense in 2005 and that he was accused of threatening to frame his former girlfriend for having a firearm. But the case against Stein was also supported by the eyewitness testimony of Christopher Russell and by Bigelow, a completely neutral bystander. There is no reasonable probability that the result of Stein's trial would have been more favorable had Winston Russell been impeached based on these materials. The Court finds that the unexhausted and defaulted claim is otherwise without merit.

27

As all of Stein's claims are without merit or procedurally defaulted, the petition for writ of habeas corpus will be denied.

IV.

Before Stein may appeal this decision, the Court must determine whether to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(1)(A); FED. R. APP. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Stein must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (punctuation modified). The Court finds that reasonable jurists would not debate the resolution of any of Stein's claims. The Court will, therefore, deny a certificate of appealability.

## IV.    CONCLUSION

Accordingly, the Court 1) denies with prejudice the amended petition for a writ of habeas corpus, and 2) denies a certificate of appealability.

**SO ORDERED.**

Dated: June 24, 2026          s/Mark A. Goldsmith
Detroit, Michigan             MARK A. GOLDSMITH
                              United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 24, 2026.

s/Joseph Heacox
JOSEPH HEACOX
Case Manager